**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

GREGORY SHANE HEGE,          )
                                    )
                Plaintiff,     )
                                    )
              v.              )        1:20CV1171
                                    )
KILOLO KIJAKAZI,            )
Acting Commissioner of Social   )
Security,                     )
                                    )
                Defendant.[1]   )

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Gregory Shane Hege, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 7 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 10, 13; see also Docket Entry 11 (Plaintiff's Brief), Docket Entry 14 (Defendant's Memorandum); Docket Entry 15 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI in 2005 (Tr. 105-14), alleging an onset date of October 31, 2003 (see Tr. 105, 111). Upon denial of those applications initially (Tr. 38-39, 54-59, 298-305, 315-31) and on reconsideration (Tr. 40-41, 61-70, 341-48, 351-67), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 73-74). Plaintiff and his attorney attended the hearing. (Tr. 9-37.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 42-54.)[2] The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-8), and Plaintiff sought judicial review in this Court, Hege v. Colvin, No. 1:11CV908, Docket Entry 1 (M.D.N.C. Oct. 26, 2011). After this Court affirmed the Commissioner's decision denying benefits, Hege, No. 1:11CV908, Docket Entry 17 (M.D.N.C. July 21, 2014) (Dever, III, C.J., E.D.N.C. by desig.), and denied Plaintiff's Motion to Alter or Amend Judgment under Rule 59(e) of the Federal Rules of Civil Procedure, Hege, No. 1:11CV908, Docket Entry 22 (M.D.N.C. Oct. 7, 2014), Plaintiff appealed to the United States Court of Appeals for the Fourth Circuit, see Hege v. Colvin, No. 14-2335 (4th Cir. Dec. 8, 2014).

The Commissioner filed a consent Motion for Remand Under Sentence Four of 42 U.S.C. § 405(g), Hege, No. 14-2335, Docket

---

[2] Plaintiff filed a second application for SSI on April 22, 2009 (see Tr. 532), and a different ALJ, after a hearing, found Plaintiff disabled as of February 23, 2010, his amended alleged onset date (Tr. 521-32).

Entry 19 (4th Cir. Apr. 21, 2015), on the grounds that "the ALJ stopped [Plaintiff]'s counsel from questioning [Plaintiff] during the hearing, and stated that [the ALJ] would issue a fully favorable decision [pending the receipt of outstanding mental health records, but] . . . did not hold a supplemental hearing once the medical record evidence was submitted and he determined that a fully favorable decision was not warranted," id. at 9. The Fourth Circuit entered a Judgment remanding the matter back to the Commissioner, Hege, No. 14-2335, Docket Entry 21 (4th Cir. June 4, 2015), and the Appeals Council, on August 12, 2019, issued an order vacating the ALJ's decision and remanding the case to an ALJ for further proceedings (Tr. 511-16), on the grounds that the ALJ 1) failed to afford Plaintiff "a full hearing" (Tr. 514), 2) found Plaintiff moderately limited in concentration, persistence, or pace ("CPP"), but failed to include in the RFC "specific limitations related to [Plaintiff]'s abilities to focus attention on work activities and stay on task at a sustained rate" (id. (internal quotation marks omitted)), and 3) "gave substantial weight to the [s]tate [a]gency psychological consultants," but failed to explain why he did not include in the RFC the consultants' limitations to a "low stress, nonproduction setting with limited interaction with others" (Tr. 515 (internal quotation marks omitted)).[3]

---

[3] The record lacks an explanation for the more than four-year delay between the Fourth Circuit's Judgment and the Appeals Council's remand order. (See Tr. 515 ("The [Appeals] Council regrets the delay involved."); see also Tr. 471 (post-
(continued...)

A new ALJ subsequently held a hearing, attended by Plaintiff, his attorney, and a vocational expert ("VE"). (Tr. 461-510.) The ALJ thereafter ruled that Plaintiff did not qualify as "disabled" under the Act at any time from his onset date of October 31, 2003, to February 22, 2010, the day before the ALJ adjudicating Plaintiff's second application for SSI found him disabled. (Tr. 433-60.) This action for judicial review followed.[4]

In rendering that disability determination, the ALJ made the following findings:

> 1. [Plaintiff] met the insured status requirements of the . . . Act through September 30, 2008.
>
> . . .
>
> 2. From October 31, 2003, the alleged onset date, through February 22, 2010, [Plaintiff] did not engaged [sic] in substantial gainful activity.
>
> . . .

---

[3] (...continued)
remand ALJ's statement during hearing: "I cannot explain why it's spent as long as it did at the Appeals Council. Mr. Hege, I apologize on behalf of the agency for that delay. . . . I can't tell from my end why that took so long."); 533-65 (letter dated July 22, 2019, from Plaintiff's counsel to Office of Appellate Operations inquiring about status of case.)

[4] "[W]hen a case is remanded by a [f]ederal court for further consideration, the decision of the [ALJ] will become the final decision of the Commissioner after remand on [a claimant's] case unless the Appeals Council assumes jurisdiction of the case. The Appeals Council may assume jurisdiction based on written exceptions to the decision of the [ALJ] which [a claimant] file[s] with the Appeals Council or based on its authority . . . to assume jurisdiction of [a claimant's] case even though no written exceptions have been filed." 20 C.F.R. §§ 404.984, 416.1484. Here, the record reflects neither that Plaintiff filed written exceptions to the post-remand ALJ's decision with the Appeals Council nor that the Appeals Council assumed jurisdiction of his case under its own authority.

4

3.  From October 31, 2003, the alleged onset date, through February 22, 2010, [Plaintiff] had the following severe impairments: depression; anxiety; post-concussive syndrome; and alcohol use disorder.

. . .

4.  From October 31, 2003, the alleged onset date, through February 22, 2010, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5.  . . . [F]rom October 31, 2003, the alleged onset date, through February 22, 2010, [Plaintiff] had the residual functional capacity to perform a full range of work at all exertional levels but [] he could never climb ladders, ropes, or scaffolds, and he could have no exposure to unprotected heights or hazardous machinery. He was limited to understanding, remembering, and carrying out simple instructions, which is defined to mean activity that is consistent with a reasoning level of "two" or "three," as defined in the [Dictionary of Occupational Titles ("DOT")]; and he could sustain concentration, attention, and pace well enough to carry out those simple instructions for two-hour intervals over the course of an eight-hour workday. He was limited to working in proximity to, but not in coordination with, coworkers and supervisors, but would still have been able to interact with others sufficiently to complete a 30-day training period. He was limited to working in a low stress setting, which is specifically defined to mean: no paced production, such as on an assembly line; only simple, work-related decisions; few or no changes in the work setting; no dealing with emergent situations as an essential function of the job; and only superficial contact with the public, where "superficial" is defined to mean the contact is incidental and not an essential function of the job.

. . .

6.  [Plaintiff] was unable to perform any past relevant work.

. . .

5

10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform.

. . .

11. [Plaintiff] was not been [sic] under a disability, as defined in the . . . Act, from October 31, 2003, through February 22, 2010.

(Tr. 439-53 (bold font, internal parenthetical citations, and footnotes omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan,

6

993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981),

7

and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[5] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475

---

[5] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. [SSI] . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

n.2 (4th Cir. 1999).[6] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, the "claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, *i.e.*, "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[7] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to

---

[6] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[7] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job."  Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled.  Hines, 453 F.3d at 567.[8]

## B.  Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ . . . found that [Plaintiff]'s post-concussion syndrome [('PCS')] c[ould] reasonably be expected to cause his claimed alterations of awareness, but failed to determine the extent to which [Plaintiff] actually experience[d] such episodes[, and] . . . therefore committed a reversible error [under Monroe v. Colvin, 826 F.3d 176 (4th Cir. 2016),] on the basis that it cannot be determined whether the ALJ's hypothetical questions to [the VE] include[d] all of [Plaintiff]'s functional limitations" (Docket

---

[8]  A claimant thus can establish disability via two paths through the SEP.  The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis.  See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

Entry 11 at 8 (bold font and single-spacing omitted); see also
Docket Entry 15 at 2-6);

2) "[Plaintiff]'s [PCS] is a medically determinable impairment
that results in the entirely subjective symptom of non-epileptic
alterations of awareness[, and Plaintiff] is therefore entitled
[under Arakas v. Commissioner of Soc. Sec. Admin., 983 F.3d 83 4th
Cir. 2020),] to rely exclusively on subjective evidence to prove
the severity, persistence, and limiting effects of his non-
epileptic alterations of awareness" (Docket Entry 11 at 11 (bold
font and single-spacing omitted); see also Docket Entry 15 at 6-
16); and

3) "[t]he ALJ . . . cited the regulatory standards for
evaluating symptoms, but not the standards for evaluating [RFC
and] . . . therefore committed a reversible error [under Dowling v.
Commissioner of Soc. Sec., 986 F.3d 377 (4th Cir. 2021),] by
relying on an incorrect regulatory framework to assess
[Plaintiff]'s [RFC]" (Docket Entry 11 at 15 (bold font and single-
spacing omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's
decision. (Docket Entry 14 at 8-15.)

## 1. Error Under Monroe

In Plaintiff's first issue on review, he contends that "[t]he
ALJ . . . found that [Plaintiff]'s [PCS] c[ould] reasonably be
expected to cause his claimed alterations of awareness, but failed

to determine the extent to which [Plaintiff] actually experience[d] such episodes[, and] . . . therefore committed a reversible error [under Monroe] on the basis that it cannot be determined whether the ALJ's hypothetical questions to [the VE] include[d] all of [Plaintiff]'s functional limitations." (Docket Entry 11 at 8 (bold font and single-spacing omitted); see also Docket Entry 15 at 2-6.) In that regard, Plaintiff notes that, in Monroe, the plaintiff "'testified that he would lose consciousness about two or three times per day and would need to take several breaks during the day because of fatigue[,]' [b]ut the ALJ 'never made specific findings about whether [the plaintiff]'s apnea or narcolepsy would cause him to experience episodes of loss of consciousness or fatigue necessitating breaks in work and if so, how often th[o]se event would occur'" (Docket Entry 11 at 9 (internal citation omitted) (quoting Monroe, 826 F.3d at 188)) and thus the court could not "'determine whether the hypothetical questions posed to the VE included all of [the plaintiff]'s functional limitations'" (id. at 9-10 (quoting Monroe, 826 F.3d at 188)). According to Plaintiff, "[t]he facts of this case are remarkably similar to the facts of Monroe" (id. at 10), because "[t]he ALJ found [PCS] to be a severe medically determinable impairment" (id. (citing Tr. 440)), and that Plaintiff's "'medically determinable impairments could reasonably be expected to cause the alleged symptoms'" (id. (quoting Tr. 444)), "[b]ut[,] in assessing [Plaintiff]'s RFC, [the ALJ] did not

discuss the effect of non-epileptic alterations of awareness" (id. (citing Tr. 451)).  Plaintiff's contentions miss the mark.[9]

As an initial matter, Plaintiff overstates the ALJ's findings by asserting that "[t]he ALJ . . . found that [Plaintiff]'s [PCS] c[ould] reasonably be expected to cause his claimed alterations of awareness."  (Id. at 8 (emphasis added) (bold font and single-spacing omitted); see also Docket Entry 15 at 2.)  The ALJ actually found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the [] symptoms" Plaintiff alleged. (Tr. 444 (emphasis added).)  The ALJ further found that Plaintiff's "medically determinable impairments" included "depression[,] anxiety[,] [PCS,] and alcohol use disorder" (Tr. 440), and described his symptoms as "problems with equilibrium, lack of coordination, cognitive problems, [] memory problems[,] spells of semi-consciousness and sensitivity to light and sound" (Tr. 444). Thus, the ALJ did not specifically find that Plaintiff's PCS could

---

[9] Plaintiff additionally argues that "[t]he ALJ [] failed to perform the function-by-function assessment of [Plaintiff]'s non-epileptic alterations of awareness." (Docket Entry 11 at 11; see also Docket Entry 15 at 5.)  With regard to the function-by-function analysis, the relevant administrative ruling states: "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. . . .  Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."  Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing [RFC] in Initial Claims, 1996 WL 374184, at *1 (July 2, 1996) ("SSR 96-8p").  Plaintiff, however, did not identify any specific "functions" that the ALJ should have analyzed; rather, Plaintiff's argument more generally faults the ALJ for failing to discuss the effects of Plaintiff's "alterations of awareness" on the RFC.  (See Docket Entry 11 at 6-11; see also Docket Entry 15 at 2-6.)  Accordingly, this Recommendation will focus on whether the ALJ sufficiently explained her consideration of Plaintiff's alleged blackout spells in formulating the RFC.

cause "<u>alterations of awareness</u>" (Docket Entry 11 at 8 (emphasis added)). (<u>See</u> Tr. 451 ("[T]he 2009 neuropsychological evaluation cast doubt what limitations, <u>if any</u>, were being caused by [Plaintiff]'s [PCS]." (emphasis added)).)[10]

Even more significantly, "[w]hen an ALJ finds in a claimant's favor at part one, he or she merely finds that objective medical evidence shows that the claimant possesses <u>impairments</u> that could reasonably be expected to cause the symptoms alleged, and not that the claimant actually suffers from the <u>symptoms</u> alleged." <u>Pickard v. Colvin</u>, No. 1:14CV583, 2015 WL 4644792, at *5 (M.D.N.C. Aug. 4, 2015) (unpublished), <u>recommendation adopted</u>, 2015 WL 5344027 (M.D.N.C. Sept. 14, 2015) (unpublished) (Schroeder, J.). Here, although the ALJ did not make a <u>specific</u> finding discounting Plaintiff's testimony about his blackout spells (<u>see</u> Tr. 443-51), the ALJ's decision nevertheless adequately explains how she addressed those spells in the RFC.

To begin, the ALJ's discussion of Plaintiff's subjective symptom reports explains the ALJ's decision-making regarding

_____

[10] Indeed, the record contains conflicting evidence regarding the cause of Plaintiff's alleged blackout spells. (<u>See</u> Tr. 284-96 (mental health providers considering whether Plaintiff's blackout spells constituted panic attacks), 258 (neurologist characterizing blackout spells as "probably" from PCS but also as "possible panic attacks"), 683 (therapist discussing whether childhood emotional trauma caused Plaintiff's "dissociative episodes"), 736 (psychiatrist reporting difficulty in knowing whether Plaintiff had "conversion or factitious symptoms or poor coping skills"), 738 (same psychiatrist noting difficulty determining whether Plaintiff's spells resulted from "personality vs. anxiety vs. . . . some type of organic problem" and indicating "doubt" as to organic problem involvement), 747 (neuropsychologist opining that "nothing" about Plaintiff's "clinical profile [] suggested old brain injury as the nexus of his difficulties" and that "even 3 concussions should not produce the kinds of cognitive deficits" seen on evaluation).)

Plaintiff's alleged spells. The ALJ expressly acknowledged Plaintiff's "report[s] that he had spells of semi-consciousness" (Tr. 444; see also Tr. 158, 194, 491-96, 500-01), as well as his statements to a neurologist "that he initially had spells where he would black out about once per month, but that these had increased to as many as 12 episodes per day" and "that he could see and hear during these spells, but that everything was garbled" (Tr. 445; see also Tr. 260). The ALJ, however, found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision" (Tr. 444).

In further support of that finding, the ALJ observed that "[Plaintiff]'s allegations and even reports to treating and examining sources have been at times inconsistent with the documentary and contemporaneous records and at other times complicated by his alcohol use[, and that, a]s a result of those inconsistencies, the [ALJ] f[ou]nd[] that the objective findings and documentation [we]re of greater value than [Plaintiff]'s subjective and uncorroborated statements." (Tr. 448 (emphasis added).) The ALJ also noted that Plaintiff could "perform many routine activities of daily living, such as grocery shopping, preparing meals, performing housework, and taking care of his animals," as well as that "he enjoyed working on puzzles, reading,

15

[] playing video games[,] . . . work[ing] on his vegetable garden, and perform[ing] mechanical work on cars and welding." (Tr. 447.) As discussed in more detail in the context of Plaintiff's second issue on review, the ALJ did not err in her evaluation of Plaintiff's subjective symptom reporting.

The ALJ's evaluation of the opinion evidence additionally explains the ALJ's reasoning concerning Plaintiff's claimed blackouts. In that regard, the ALJ accorded "moderate weight" (Tr. 448) to the opinions of the state agency psychological consultants that, notwithstanding Plaintiff's complaints of "fainting episodes" (Tr. 368), Plaintiff remained capable of "[simple, routine, and repetitive tasks ('SRRTs')] in a low stress, nonproduction setting with limited interaction with others" (Tr. 317; see also Tr. 367). The ALJ noted that, although she agreed with the consultants' limitations, she fashioned more specific, "vocationally appropriate" restrictions in the mental RFC to further account for "the updated evidence in the record" (Tr. 449). The ALJ additionally afforded "significant weight" to the opinions of neuropsychologist Dr. C. Thomas Gualtieri, who opined that "there was nothing about [Plaintiff's] present cognitive status that should interfere with his ability to do the kinds of unskilled labor that he did before [his alleged motor vehicle accidents in the early 1990's]." (Tr. 450 (emphasis added); see also Tr. 747.)

16

Furthermore, the ALJ's discussion of the medical evidence explains the ALJ's consideration of Plaintiff's blackout allegations. In that regard, the ALJ noted that:

- On May 4, 2005, neurologist "Dr. [Raymond S.] Kandt observed that [Plaintiff] had a slow reaction time and . . . mild disequilibrium, but that he had normal heel and toe walking and no asymmetry, ataxia, or falling with gait testing." (Tr. 445 (citing Tr. 260-62) (emphasis added));

- "[O]n December 12, 2005[, Plaintiff] reported [to psychiatrist Dr. Brent Joye] that . . . he was continuing to abuse alcohol occasionally, but that his main problem was that he was feeling depressed." (Id. (citing Tr. 271) (emphasis added));

- "By May 23, 2007, Dr. Joye reported that [Plaintiff] appeared to be doing quite well . . . . In November 2007, [Plaintiff] reported that he was lifting weights and using a NordicTrack to try to get in shape . . . . On March 3, 2008, Dr. Joye continued to report that [Plaintiff] was doing fairly well and . . . reported that [Plaintiff]'s mood was mostly euthymic and that he had a full affect." (Tr. 446 (citing Tr. 417, 419, 422) (emphasis added) (internal parenthetical citation omitted));

- "[O]n September 1, 2009[, Plaintiff] reported [to psychiatrist Dr. Geri Snoke] that he felt that his condition had improved[] and[,] . . . on September 9, 2009[, h]e reported that he . . . had apparent panic attacks, but that he had been having them for a long time and had learned how to deal with them. Upon a mental status examination, Dr. Snoke observed that [Plaintiff] was calm, pleasant, and composed, and that he appeared to have only some mild cognitive problems." (Id. (citing Tr. 740-41, 743) (emphasis added) (internal parenthetical citation omitted));

- "On January 28, 2010, Dr. Snoke reported that [Plaintiff] did not mention anything about his cognitive spells, and he declined being interested

17

or able to attend group therapy. Dr. Snoke also reviewed [Plaintiff]'s previous hospitalization records [from one of his motor vehicle accidents in 1993 and from his February 2007 psychiatric inpatient treatment], and noted that he had been intoxicated at those times, so <u>there was nothing definite to corroborate his complaints of cognitive problems</u>." (Tr. 446-47 (citing Tr. 736-37) (emphasis added) (internal quotation marks and parenthetical citation omitted));

- "On December 9, 2009, [Plaintiff] underwent a neuropsychological evaluation conducted by [Dr.] Gualtieri . . . . Following his evaluation, Dr. Gualtieri noted that [Plaintiff]'s <u>performance was what one might expect in a patient with chronic mood disorder and long-standing problems with alcoholism</u>. However, he reported that there was <u>nothing about [Plaintiff]'s clinical profile that suggested an old brain injury as the nexus of his difficulties</u>. [Dr. Gualtieri] reported that the evaluation was '<u>suggestive of exaggeration</u>' and also noted that [Plaintiff] tended to do better on harder tests and worse on easy tests; that he had a <u>speech problem that was not what [Dr. Gualtieri] would normally associate with a closed head injury</u>; and that [Plaintiff] <u>generated a number of invalid indicators</u> on the testing." (Tr. 447 (citing Tr. 747-57) (emphasis added) (internal parenthetical citation omitted)); and

- "On February 23, 2010, [Plaintiff] underwent a psychological consultative evaluation conducted by Cheri Anthony, Ph.D . . . Upon a mental status examination, Dr. Anthony observed that [Plaintiff] had only <u>minor</u> difficulties with attention, and that he generally did <u>well</u> with his memory." (<u>Id.</u> (citing Tr. 719-23) (emphasis added)).

The ALJ thereafter concluded, "[a]fter reviewing all of the evidence, . . . that [Plaintiff] had <u>some</u> mental impairments, which were <u>complicated by heavy alcohol use</u> for much of the period," but that "the evidence show[ed] that he should have been able to understand, remember, and carry out simple instructions, and that

18

he should have been able to sustain his concentration, attention, and pace sufficient to carry out simple instructions for two-hour periods over the course of an eight-hour workday in low stress work settings."  (Tr. 451 (emphasis added).)

As a result of the ALJ's thorough analysis of the record evidence, the Court can trace the path of the ALJ's reasoning with regard to Plaintiff's alleged blackout spells.  The ALJ clearly did not fully credit Plaintiff's allegations regarding the intensity, persistence, and limiting effects of the claimed spells (see Tr. 444, 448), but nevertheless included <u>significant</u> limitations in the RFC to account for such spells, such as restrictions on climbing and exposure to hazards, as well as limitations to simple instructions and decisions, few or no changes in the work setting, reduced interaction with others, and non-production work (see Tr. 443).

In sum, Plaintiff's first issue on review does not warrant relief.

## 2. Error Under <u>Arakas</u>

In Plaintiff's second assignment of error, he asserts that "[Plaintiff]'s [PCS] is a medically determinable impairment that results in the entirely subjective symptom of non-epileptic alterations of awareness[, and Plaintiff] is therefore entitled [under <u>Arakas</u>] to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of his non-

19

epileptic alterations of awareness." (Docket Entry 11 at 11 (bold font and single-spacing omitted); see also Docket Entry 15 at 6-16.) In particular, Plaintiff maintains that the Fourth Circuit in Arakas "noted that fibromyalgia is 'a disease whose symptoms are entirely subjective,'" (Docket Entry 11 at 12 (quoting Arakas, 983 F.3d at 96)), and thus "held that 'ALJs may not rely on objective medical evidence (or the lack thereof) – even as just one of multiple medical factors – to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence'" (id. (quoting Arakas, 983 F.3d at 97)). According to Plaintiff, "[t]here is '[n]o single test' to confirm diagnosis of [PCS]" (id. at 13-14 (quoting https://www.mayoclinic.org/diseases-conditions/post-concussion-syndrome/diagnosis-treatment/drc-20353357)), and "diagnosis of non-epileptic alterations of awareness is not based on [] objective medical evidence [such as electroencephalogram ('EEG') tests and brain MRIs] because they do not result from electrical activity in the brain" (id. at 14 (citing https://www.cedars-sinai.org/health-library/diseases-and-conditions/n/non-epileptic-seizures.html)). Accordingly, Plaintiff argues, "[l]ike fibromyalgia, [PCS] is entirely subjective in that it is not susceptible to verification by objective medical evidence." (Id.) Plaintiff thus faults the ALJ for finding that "'the objective findings and documentation are

20

of greater value tha[n Plaintiff]'s subjective and uncorroborated statements.'" (Id. (quoting Tr. 448).)  Those arguments lack merit.

As an initial matter, Plaintiff's contentions that "'[n]o single test'" exists "to confirm [a] diagnosis of [PCS]" (id. at 13-14 (emphasis added) (quoting https://www.mayoclinic.org/diseases-conditions/post-concussion-syndrome/diagnosis-treatment/drc-20353357)) and that "diagnosis of non-epileptic alterations of awareness is not based on [] objective medical evidence" (id. at 14 (emphasis added) (citing https://www.cedars-sinai.org/health-library/diseases-and-conditions/n/non-epileptic-seizures.html)) miss the point.  Arakas forbids the discounting of symptoms that do not produce objective medical evidence, Arakas, 983 F.3d at 96-97, as clearly ALJs may require objective evidence of the disease itself at part one of the subjective symptom reporting inquiry, see Craig, 76 F.3d at 595.  Moreover, the ALJ here found Plaintiff's PCS a severe, medically determinable impairment at step two of the SEP (see Tr. 440) and found, at part one of the subjective symptom analysis, that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" (see Tr. 444).  Framed properly, the Court must consider whether Plaintiff's claimed symptoms of PCS, including his blackout spells, qualify as "entirely subjective," Arakas, 983 F.3d at 96 (internal quotation marks omitted), such that the ALJ erred

21

in considering objective evidence in discounting Plaintiff's subjective complaints at part <u>two</u> of the inquiry.

In that regard, Plaintiff has alleged that his PCS caused him to suffer blackout spells, slowed reaction times, memory disturbance, disequilibrium, decreased concentration, speech deficits, and reduced coordination (<u>see</u> Tr. 16-17, 19 23, 26, 158, 192, 194, 235, 257, 260, 276, 284, 338, 396, 399, 422, 426, 719-20, 738, 740, 744, 750), none of which qualify as "entirely subjective," <u>Arakas</u>, 983 F.3d at 96 (internal quotation marks omitted). Significantly, unlike the pain, fatigue, and subjective weakness of fibromyalgia, Plaintiff has readily admitted that his blackout spells constitute <u>observable</u> phenomena, and that co-workers and family members have witnessed him remaining in one spot staring into space and not responding to others. (<u>See</u> Tr. 194 ("Friends and family have witnessed me trying to accomplish a simple task (e.g. making a sandwich) and end up sitting or standing idly with a blank stare uncomprehensively [sic] for long periods up to hours." (capitalization omitted)), 338 (complaining of "spells where he has just blanked out and stood in the same spot for at least a couple of hours according to his family members"), 495 ("My father and I spend a lot of time watching TV now, and there are times that he can recognize that I'm in that state."), 738 (indicating that previous employers witnessed his spells and thought "he was drunk or high or 'playing possum'"), 744 (reporting

22

that unidentified individual found Plaintiff during spell walking on road behind his house and "it was like he was an elderly person with Alzheimer's," as well as that his nephew saw Plaintiff sitting or standing in kitchen for four hours).)  Similarly, the record contains numerous instances on which Plaintiff's health care providers <u>objectively</u> tested Plaintiff's reaction times (<u>see</u> Tr. 257-58, 261, 741, 745), memory (<u>see</u> Tr. 261, 296, 308, 397, 403, 420, 424, 722, 753), equilibrium (or balance) (<u>see</u> Tr. 235, 257-58, 261, 753), concentration (<u>see</u> Tr. 397, 403, 420, 424, 722, 753), speech (<u>see</u> Tr. 257-58, 306, 385, 390, 403, 420, 424, 719, 721, 753), and coordination (<u>see</u> Tr. 235, 257, 261, 308, 389, 753). Accordingly, unlike "fibromyalgia — a disease whose symptoms are entirely subjective, with the exception of trigger-point evidence," and where "[p]hysical examinations will usually yield normal results — a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions," <u>Arakas</u>, 983 F.3d at 96 (internal quotation marks and bracketed language omitted), Plaintiff's alleged PCS symptoms qualify as <u>objectively</u> verifiable and thus <u>Arakas</u> lacks application to this case.

In addition, although <u>Arakas</u> "reiterate[d] the long-standing law in [the Fourth C]ircuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms," <u>Arakas</u>, 983 F.3d at 98, long-standing cases containing the substance of that

23

holding, such as Craig and Hines (among others), clarify that,

"[a]lthough a claimant's allegations about her [symptoms] may not

be discredited solely because they are not substantiated by

objective evidence of the [symptoms themselves] or [their]

severity, they need not be accepted to the extent they are

inconsistent with the available evidence, including objective

evidence of the underlying impairment, and the extent to which that

impairment can reasonably be expected to cause the [symptoms] the

claimant alleges []he suffers," Craig, 76 F.3d at 595 (emphasis

added); see also Hines, 453 F.3d at 565 n.3 (quoting Craig, 76 F.3d

at 595). In other words, under the appropriate circumstances, an

ALJ may choose to rely exclusively on a claimant's subjective

symptom reports to find disabling symptoms; however, Arakas does

not compel ALJs to consider only subjective evidence, as such a

requirement would conflict with the regulations, which plainly

require ALJs to consider a variety of factors, including objective

medical evidence, in evaluating the intensity, persistence, and

limiting effects of symptoms. See 20 C.F.R. §§ 404.1529(c),

416.929(c) (directing ALJs to assess a claimant's medical history,

medical signs and laboratory findings, daily activities, testimony

about nature and location of pain, medication and other treatment

used to alleviate pain, along with medical opinions from examining

and non-examining sources); see also 42 U.S.C. § 423(d)(5)(A)

("Objective medical evidence of pain . . . established by medically

24

acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) <u>must</u> be considered in reaching a conclusion as to whether [an] individual is under a disability." (emphasis added)).

Here, in compliance with <u>Arakas</u>, <u>Hines</u>, and <u>Craig</u>, the ALJ considered the objective medical evidence as <u>one part</u> of her evaluation of the intensity, persistence, and limiting effects of Plaintiff's alleged blackout spells. As detailed in the discussion of Plaintiff's first issue on review, the ALJ additionally considered the opinion evidence of record (<u>see</u> Tr. 448-51) and commented on the type and effectiveness of Plaintiff's treatment, noting that Plaintiff reported multiple times that his psychiatric medications helped alleviate his symptoms (Tr. 445-46; <u>see also</u> Tr. 232, 271, 339-40, 406-07, 743). The ALJ also discussed Plaintiff's daily activities, observing that, despite complaints of disabling symptoms, Plaintiff remained able to "perform many routine activities of daily living, such as grocery shopping, preparing meals, performing housework, and taking care of his animals," as well as that "he enjoyed working on puzzles, reading, [] playing video games[,] . . . work[ing] on his vegetable garden, and perform[ing] mechanical work on cars and welding" (Tr. 447 (citing Tr. 418, 422, 426, 721, 757)).

In Plaintiff's Reply, he maintains that "[t]he ALJ in this case discounted [Plaintiff]'s reports of [PCS] symptoms, in part,

25

because he engaged in daily activities such as performing 'mechanical work on cars and welding'" (Docket Entry 15 at 12 (internal parenthetical citation omitted) (quoting Tr. 447)), but "failed to consider [] qualifying statements by [Plaintiff]" (id. at 13).  In that regard, Plaintiff points to his testimony that "'[t]here were some days that [he] could do fairly good and work for hours on it, and then there was [sic] days that [he] couldn't really do anything'" (id. at 12 (quoting Tr. 499)), and that he worked on the truck "'maybe three days' a week over the course of a year 'and it was different lengths of time that [he] was able to stay out there'" (id. at 13 (quoting Tr. 499)).  Plaintiff notes that the court "in Arakas held that the ALJ 'erred by discrediting [the plaintiff]'s subjective complaints as inconsistent with her daily activities' because the ALJ 'improperly disregarded her qualifying statements regarding the limited extent to which she could perform daily activities.'" (Id. at 12 (quoting Arakas, 983 F.3d at 99).)

Plaintiff's argument glosses over the fact that the record contains competing descriptions of Plaintiff's ability to engage in mechanical and welding work.  Although Plaintiff testified to varying ability to work on his own truck (see Tr. 499; see also Tr. 418 (reflecting Plaintiff's report to Dr. Joye that Plaintiff had "been spending his summer working on his truck trying to make repairs")), other parts of the record cited by the ALJ reflect that

26

Plaintiff worked on vehicles <u>other than his own truck</u> and did welding work for cash (<u>see</u> Tr. 447 (citing Tr. 422 (Plaintiff "tr[ied] to stay busy working on rebuilding cars"), 426 (Plaintiff "<u>occasionally</u> g[ot] frustrated because he c[ould]'t perform <u>continually</u> as far as . . . being able to work on cars like he want[ed] to" (emphasis added)), 757 (Plaintiff "d[id] mechanical work and welding on the side"); <u>see also</u> Tr. 748 (Plaintiff "ma[d]e small sums of money doing mechanical work, welding, etc., in the cash economy")). The ALJ apparently chose to credit Plaintiff's contemporaneous statements to medical providers over his self-serving hearing testimony, and Plaintiff has not provided the Court with any basis to disturb the ALJ's resolution of that conflicting evidence. <u>See</u> <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990) ("Ultimately, it is the duty of the [ALJ] reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence.").

Plaintiff's Reply further challenges the ALJ's observation that "'later evidence specifically evaluating [PCS] has shown only mild cognitive deficits' and that a 'December 2009 neuropsychological evaluation even noted that there was nothing to suggest that his closed head injury was the nexus for his problems.'" (Docket Entry 15 at 13-14 (quoting Tr. 447).) According to Plaintiff, "it is not true that the [PCS] evidence only shows mild cognitive deficits," because "[t]hat evidence also

27

documents ongoing non-epileptic alterations of awareness" arising out of his PCS. (Id. at 14; see also id. (citing Tr. 738, 740, 744 ("report[s] to his psychiatrist in [2009] that he was still having such episodes")).) Plaintiff further deems "the December 2009 neuropsychological evaluation . . . irrelevant to [Plaintiff]'s episodes of non-epileptic alterations of awareness because the report of the evaluation d[id] not address those episodes[, and] . . . the neuropsychologist [neither] opine[d] that [Plaintiff] d[id] not have [PCS n]or that he d[id] not have non-epileptic alterations of awareness related to that condition." (Id. (citing Tr. 747-57).)

Plaintiff's circular argument does not aid his cause. He essentially argues that the ALJ should not have discounted Plaintiff's reports of blackout spells, because the evidence shows he continued to complain of blackout spells. Moreover, the ALJ did not misrepresent or "cherry-pick" the record when she pointed out, correctly, that later evidence showed only "mild cognitive deficits" (Tr. 447): the ALJ expressly discussed Dr. Anthony's observation in 2010 "that [Plaintiff] had only minor difficulties with attention, and that he generally did well with his memory" (id. (emphasis added) (citing Tr. 719-23)). Furthermore, Dr. Gualtieri did consider Plaintiff's reports of blackout spells in the 2009 neuropsychological evaluation (see Tr. 749 (Dr. Gualtieri's statement in "History of the Present Condition" that

Plaintiff's "psychiatrist diagnosed [PCS]"), 750 (Dr. Gualtieri's notation that Plaintiff "continues to complain . . . about problems with . . . altered consciousness")) and thus Dr. Gualtieri's conclusions that "there was <u>nothing</u> about [Plaintiff]'s clinical profile that suggested an old brain injury as the nexus of his difficulties" and that his testing results "suggest[ed ] <u>exaggeration</u>" (Tr. 757 (emphasis added)) clearly hold relevance to the ALJ's evaluation of Plaintiff's alleged spells.

Put simply, Plaintiff's second assignment of error fails to establish prejudicial error under <u>Arakas</u>.

### 3. Error Under <u>Dowling</u>

Lastly, Plaintiff maintains that "[t]he ALJ . . . cited the regulatory standards for evaluating symptoms, but not the standards for evaluating [RFC and] . . . therefore committed a reversible error [under <u>Dowling</u>] by relying on an incorrect regulatory framework to assess [Plaintiff]'s [RFC]." (Docket Entry 11 at 15 (bold font and single-spacing omitted).) According to Plaintiff, the <u>Dowling</u> court "held that, among other errors, an ALJ 'relied on an incorrect regulatory framework when he assessed [the plaintiff]'s RFC[, because the ALJ neither] cite[d] to 20 C.F.R. § 416.945, . . . [a r]egulation[] that . . . explains how ALJs should assess a claimant's RFC, n]or . . . cite[d] to [Social Security Ruling 96-8p, <u>Policy Interpretation Ruling Titles II and XVI; Assessing Residual Functional Capacity in Initial Claims</u>, 1996

29

WL 374184 (July 2, 1996) ("SSR 96-8p"), which] provides guidance on how to properly evaluate an RFC,'" but rather based the "'RFC determination . . . entirely on [Social Security Ruling 96-7p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186 (July 2, 1996) ("SSR 96-7p")] and [Social Security Ruling 16-3p, Evaluation of Symptoms in Disability Claims, 2017 WL 5180304 (Oct. 25, 2017) ("SSR 16-3p")], which set out the process ALJs use to evaluate the intensity and persistence of [a claimant's] symptoms.'" (Id. at 15-16 (internal quotation marks omitted) (quoting Dowling, 986 F.3d at 387).) Plaintiff notes that the court in Dowling found that, because "'an RFC assessment is a separate and distinct inquiry from a symptom evaluation, [] the ALJ erred treating them as one and the same.'" (Id. at 16 (quoting Dowling, 986 F.3d at 387).) Plaintiff maintains that, "[l]ike the ALJ in Dowling, the ALJ in this case did not cite the regulatory provisions regarding assessment of RFC, . . . [but i]nstead . . . cited 20 C.F.R. §§ 404.1529 and 416.929, which are regulations regarding evaluation of symptoms, 20 C.F.R. §§ 404.1527 and 416.927, which are regulations regarding evaluation of medical opinions, and SSR 16-3p, which is a ruling regarding evaluation of symptoms." (Id. at 16-17 (citing Tr. 443) (internal parenthetical citation omitted).) For the reasons explained more fully below, Plaintiff's arguments fail as a matter of law.

30

Contrary to Plaintiff's arguments, the ALJ here did cite to the correct standards governing the assessment of RFC. Although Plaintiff focuses on one page of the ALJ's decision to fault the ALJ for failing to cite the proper standards (see Docket Entry 11 at 16-17 (citing Tr. 443)), Plaintiff ignores the following recitation by the ALJ of the appropriate standards:

> Before considering step four of the [SEP], the [ALJ] must first determine [Plaintiff]'s [RFC] (20 CFR 404.1520(e) and 416.920(e)). An individual's [RFC] is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, the [ALJ] must consider all of [Plaintiff]'s impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p).

(Tr. 439 (emphasis added).)[11]   In light of the above-quoted paragraph, the ALJ did not err under Dowling.

In short, Plaintiff's third issue on review lacks merit.

_____

[11] Significantly, Defendant's Memorandum pointed Plaintiff to the above-cited page of the ALJ's ruling, which explicitly references the very regulatory provisions that Plaintiff's Brief falsely accused the ALJ of failing to cite "[l]ike the ALJ in _Dowling_" (Docket Entry 11 at 16 ("[T]he ALJ in this case did not cite the regulatory provisions regarding assessment of RFC." (internal citation omitted) (citing Tr. 443)); see also id. at 15 (identifying 20 C.F.R. § 416.945 and SSR 96-8p as regulatory provisions Fourth Circuit singled out as missing in Dowling)).   (See Docket Entry 14 at 15 (citing Tr. 439 as proof that ALJ complied with Dowling's directive to apply, inter alia, "20 C.F.R. § 416.945" and "SSR 96-8p" in "determin[ing] the claimant's RFC").)   Plaintiff's Reply, however, fails to acknowledge his prior misrepresentation that, "[l]ike the ALJ in _Dowling_, the ALJ in this case did not cite th[ose] regulatory provisions regarding assessment of RFC" (Docket Entry 15 at 1-16.)   Instead, Plaintiff's Reply sub silentio abandons his Dowling claim.  (See id.)   The Court expects better from members of its bar, particularly when a member has, in the same filing that failed to admit, apologize for, or explain an exposed misstatement of the record, hyperbolically accused Defendant's counsel of "an outright fabrication" (id. at 1), when the record, in fact, shows no such thing, but instead shows, at most, an unwarranted characterization by Defendant's counsel of the tack taken in Plaintiff's Brief.  Put another way, all attorneys - but especially attorneys who (over aggressively) attack the professionalism of their adversaries - should take better care to take accountability for their own (serious) mistakes.

31

### III.  CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment Reversing the Decision of the Commissioner of Social Security (Docket Entry 10) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 13) be granted, and that this action be dismissed with prejudice.


/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

February 23, 2022

32